# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| VICTORIA M.,[1] <br> *Plaintiff,* <br><br> v. <br><br> KILOLO KIJAKAZI, <br> *Defendant.* | No. 3:21-cv-1575 (VAB) |

## RULING AND ORDER ON MOTIONS REGARDING THE COMMISSIONER'S DECISION

Victoria M. ("Plaintiff") has filed this administrative appeal under 42 U.S.C. § 405(g) against Kilolo Kijakazi, the Acting Commissioner of Social Security ("Defendant" or "the Commissioner"), seeking to reverse the decision of the Social Security Administration denying her claims under Title II and Title XVI of the Social Security Act. Compl. ¶ 6, ECF No. 1.

Plaintiff has moved for an order reversing the Commissioner's decision or, in the alternative, remanding the case for a new hearing, while the Commissioner has moved for an order affirming the decision. *See* Pl.'s Mot. for an Order Rev'ing the Decision of the Comm'r or in the Alternative Mot. for Remand for a Hr'g, ECF No. 12 ("Pl.'s Mot."); Pl.'s Mem. in Supp. of Pl.'s Mot., ECF No. 12-1 ("Pl.'s Mem."); Def.'s Mot. for an Order Aff'ing the Decision of the Comm'r, ECF No. 14 ("Comm'r's Mot."); Def.'s Mem. in Supp. of her Mot., ECF No. 14-1 ("Def.'s Mem.").

---

[1] In opinions issued in cases filed under § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), this Court will identify and reference any non-government party solely by first name and last initial in order to protect the privacy interests of social security litigants while maintaining public access to judicial records. *See* Standing Order – Social Security Cases (D. Conn. Jan. 8, 2021).

For the following reasons, Plaintiff's motion is **GRANTED**, and the Commissioner's motion is **DENIED**. The decision of the Commissioner is **VACATED** and **REMANDED** for further proceedings consistent with this Ruling and Order.

On remand, the ALJ is instructed to develop the record further by attempting to obtain assessments from Plaintiff's treating providers regarding her mental residual functional capacity.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Background

Plaintiff alleges that she is disabled based on a combination of conditions, including mental illness, hypertension, related chronic kidney disease, degenerative spinal conditions that cause lower back pain, visual impairment, and obesity. Tr. of Administrative Proceedings at 33, ECF No. 24 ("Tr.") (Tr. of Oral Hr'g.); Pl.'s Mem. at 1.

On March 29, 2019, Plaintiff filed a protective Title II application for a period of disability and disability insurance benefits, alleging disability beginning on February 16, 2018. Tr. at 12. Plaintiff the filed an application for supplemental social security income ("SSI") on April 12, 2019. *Id.* at 216 (Ex. B3D, Application for Supplemental Security Income).

Plaintiff was forty-seven years old at the time of the alleged onset of her disability, February 16, 2018. *See id.* at 22 (ALJ Decision (Mar. 4, 2021)).[2] She has a high school education and, before her alleged onset date, worked as a house cleaner, a home health aide, and a cashier checker. *Id.* at 21, 34, 299 (Ex. B1E, Disability Report – Form SSA-3368). Plaintiff has not been employed since September 2017. *Id.* at 295.

---

[2] Unless otherwise indicated, page numbers refer to the administrative transcript page numbers printed in the bottom-right corner and used by the parties in their briefing rather than the ECF-generated page numbers printed at the top of the document.

On August 14, 2019, Plaintiff's application was initially denied. *Id.* at 96 (Ex. B3A Disability Determination Explanation – Initial). Her application was then denied on rehearing on November 13, 2019. *Id.* at 119 (Ex. B5A, Disability Determination Explanation – Reconsideration).

On October 29, 2020, Plaintiff received a hearing before ALJ Ryan Alger. *Id.* at 29–51.

On March 1, 2021, the ALJ issued a decision. He found that Plaintiff had the following medically determinable severe impairments: seizures, degenerative disease of the lumbar spine, obesity, and major depressive disorder. *Id.* at 14 (ALJ Decision). The ALJ also found that Plaintiff had a non-severe vision disorder. *Id.* Nonetheless, the ALJ concluded that Plaintiff was not disabled and denied her application for benefits. *Id.* at 23.

On April 20, 2021, Plaintiff filed a request for review of the ALJ's decision by the Appeals Council. *Id.* at 206 (Ex. B12B, Request for Review of Hearing Decision). That request was denied on September 29, 2021. *Id.* at 1 (Appeals Council Decision).

### 1. Plaintiff's Testimony

Plaintiff testified at the hearing that she currently lives with her adult daughter, who cooks and cleans for her. *Id.* at 35. Plaintiff does not drive and relies on her son for transportation to medical appointments. *Id.*

Plaintiff testified that she struggles with back pain but cannot take ibuprofen for pain relief because of the risk to her kidneys. *Id.* at 36. She also takes medication for her depression, which she sometimes finds helpful. *Id.* She sometimes does not take the medication, however, because voices in her head told her not to take it. *Id.*

Plaintiff stated that she cannot walk or sit for more than about fifteen minutes without experiencing pain in her legs. *Id.* at 37–38. She also testified that she can stand for about twenty minutes on a good day. *Id.* 38.

On good days, Plaintiff testified, she can sit up in bed and watch television or do a crossword puzzle, while on bad days she will remain in bed all day. *Id.* She testified that about half her days qualify as good days, and half are bad. *Id.*

Plaintiff testified that, because of her pain management issues, she would have to miss significant time at work if she had a full-time job. *Id.* at 42.

Plaintiff also testified that she struggles to be around strangers for too long. *Id.* at 40. As a result of these issues, she last went grocery shopping in person a year and a half before her hearing. *Id.* She testified that she would bring someone with her when she went shopping because she struggles to lift things and because she might have to leave the store to avoid being around people. *Id.* at 41–42.

## 2. Medical History

On November 2, 2017, Plaintiff met with behavioral health clinician Hope Taylor, where she reported challenges with self-care and with staying out of bed when she gets overwhelmed. *Id.* at 361 (Ex. B1F, LifeBridge Community Services Progress Note). Counselor Taylor noted that Plaintiff presented as slightly disheveled, but calm and pleasant. *Id.*

Plaintiff continued to see Counselor Taylor for behavioral health appointments through December 2018. *Id.* at 353. At some of these visits, Plaintiff reported depressed mood, decreased grooming, and periods of staying in bed triggered by environmental stressors. *See id.* at 360 (Nov. 16, 2017, and Nov. 30, 2017), 359 (Jan. 11, 2018), 358–59 (Jan. 25, 2018), 357 (Apr. 6, 2018), 356 (Apr. 12, 2018, and Apr. 26, 2018), 353 (Oct. 18, 2018 and Dec. 6, 2018). At other

visits, she reported greater success in getting out of bed and managing challenges in her life. *See id.* at 358 (Feb. 22, 2028), 355–56 (May 17, 2018), 355 (June 7, 2018, and July 5, 2018), 354 (Sept. 6, 2018).

On December 1, 2017, Plaintiff presented for a primary care visit with complaints of a headache that had lasted for the past two days, as well as tingling and numbness in her hands. *Id.* at 409 (Ex. B2F, Optimus Healthcare Office Treatment Records). She also reported a backache related to retrolisthesis. *Id.* at 411.

On January 17, 2018, Plaintiff had a follow-up appointment for chronic kidney disease and was assessed with normal renal function, minimal proteinuria, and hypertensive chronic kidney disease. *Id.* at 720–21 (Ex. B9F, Park City Primary Office Treatment Records).

On January 24, 2018, Plaintiff presented to Dr. Allen Schlein with complaints of lower back pain since 2013. *Id.* at 719. Dr. Schlein assessed Plaintiff with chronic lumbar strain, instructed her in posture control, and told her to lose weight. *Id.*

On February 8, 2018, Plaintiff had an appointment for a physical therapy evaluation and plan of care. *Id.* at 889 (Ex. B13F, Yale New Haven Health Information Technology Medical Report). The appointment notes indicate that Plaintiff had ongoing back pain, which was aggravated by standing, sitting, walking, and bending. especially while walking, and that she noted increased pain with sitting, difficulty sleeping, and difficulty standing to cook or do laundry. *Id.* at 890. The notes reference an x-ray from October 2017, which showed grade one retrolisthesis of the L4 vertebra over the L5 vertebra. *Id.* She was assessed with postural deficits, impaired trunk and hip range of motion, impaired core strength, impaired lower extremity strength, impaired flexibility to the bilateral hamstring and hip flexor, as well as the upper

5

quadrant, impaired spinal segmental mobility, and soft tissue hypertonicity at the lumbar spine. *Id.* at 892.

On March 16, 2018, Plaintiff presented to primary care with complaints of headaches and heartburn. *Id.* at 401. Notes from this appointment indicate that an x-ray from December 2017 continued to show a grade one retrolisthesis of L4 over L5, as well as L3 anterior osteophyte. *Id.* The notes also indicate that Plaintiff had failed physical therapy and that an MRI had been reordered. *Id.*

On April 2, 2018, Plaintiff had an appointment with an ophthalmologist, Dr. Annette Hoo, at which Plaintiff reported blurred vision both near and at distance. *Id.* at 509 (Ex. B4F, Dr. Annette Hoo Progress Notes). Dr. Hoo reported a noticeable decline in her vision without correction. *Id.* Plaintiff was assessed with bilateral disc cupping asymmetry, ocular hypertension, defects in the nerve of the fiber layer, hyperopia, astigmatism, and presbyopia, as well as corneal hysteresis. *Id.* at 510.

On May 22, 2018, Plaintiff presented to neurology with headaches and seizures. *Id.* at 714. The appointment notes indicate that Plaintiff had been seizure-free since 2015, but that she had stopped taking one of her prescribed medications six months ago for no real reason. *Id.* Plaintiff reported that she didn't think the medication was helping with her headaches. *Id.*

On May 31, 2018, Plaintiff had a neuro-ophthalmology appointment, where she presented with blurry vision, a visual field defect, strabismus, and generalized tonic-clonic seizures with occipital cerebral infarction. *Id.* at 537.

On October 19, 2018, Plaintiff underwent a total vaginal hysterectomy, bilateral salpingo-oophorectomy, and transobturator tape placement due to symptomatic prolapse and genuine stress incontinence. *Id.* at 562 (Ex. B7F, Waterbury Hospital Records).

On February 7, 2019, Plaintiff presented to primary care after falling down the stairs the previous week. *Id.* at 665. Her x-ray was normal, although her Achilles tendon showed tenderness and swelling. *Id.* She was assessed with a strain of the left Achilles tendon. *Id.*

Plaintiff continued to have problems associated with this fall. She presented for a follow-up appointment on March 20, 2019 with severe left ankle pain, as well as swelling and limited plantar and dorsiflexion of the ankle. *Id.* at 957–58 (Ex. B15F, Franklin Surgical Office Treatment Records). She continued to report ankle pain at subsequent appointments and eventually started physical therapy. *Id.* at 962, 980 (Ex. B17F, Access Rehab Centers Progress Notes). At her initial evaluation for physical therapy, Plaintiff reported that she had difficulty taking a shower as a result of decreased standing tolerance and had to crawl to get up and down stairs. *Id.* at 980.

On April 3, 2019, Plaintiff had an initial intake appointment with Staywell Health, where she was assessed with major depression and post-traumatic stress disorder, after discontinuing her behavioral health appointments with LifeBridge Community Services. *See id.* at 1144, 1152 (Ex. B29F, Staywell Health Progress Notes); *id.* at 352.

On April 23, 2019, Plaintiff was discharged from behavioral health in order to participate in a higher level of care and was linked to care with Waterbury Hospital. *Id.* at 1138. Plaintiff was discharged after she did not make any progress in weekly therapy sessions because of the severity of her symptoms and her worsened auditory hallucinations. *Id.* at 1142.

On April 30, 2019, Plaintiff had an appointment for an initial assessment with the Waterbury Hospital Psychiatric Center. *Id.* at 967–69 (Ex. B16F, Waterbury Hospital Psychiatric Center Progress Notes). She reported that she had been struggling with depressive feelings for a long time but that her symptoms had gotten worse in the preceding four months. Plaintiff also

reported that she stays in bed all day and eats in bed; that she constantly hears voices that instruct her not to things such as taking her medication or attending medical appointments; and that she feels anxious whenever she has to leave the house, especially if she has to be around people. *Id.* at 971. Plaintiff was prescribed a mood stabilizer and an antipsychotic at this visit. *Id.* at 973.

On June 19, 2019, Plaintiff presented to neurology for clearance for possible bariatric surgery. She reported that she had not had a seizure for over a year but reported symptoms of obstructive sleep apnea. *Id.* at 993.

On June 20, 2019, at a behavior health appointment, Plaintiff reported residual symptoms of depression with her current medications. *Id.* at 1062 (Ex. B24F, Waterbury Hospital Outpatient Progress Notes).

At behavioral health appointments in August and September 2019, Plaintiff reported that her medication had improved her depression and auditory hallucination symptoms. *Id.* at 1052, 1049.

On September 24, 2019, Plaintiff had a follow-up appointment for lower back pain. *Id.* at 1088 (Ex. B27F, APRN Jennifer Schmitz Progress Notes). Plaintiff reported intermittent bilateral lumbar muscle spasms and that her lower back pain was aggravated by bending and prolonged walking. *Id.* APRN Schmitz's notes also indicate that Plaintiff has difficulty with adherence to her medication as a result of her mental health issues, including schizophrenia and auditory hallucinations. *Id.* at 1088–89.

On January 10, 2020, Plaintiff had an initial behavioral health visit to establish care at Community Health Center, Inc, where she was assessed with unspecified schizophrenia. *Id.* at 1102–04 (Ex. B28F, Community Health Progress Notes). At later behavioral health appointments, Plaintiff continued to report symptoms of depression and auditory hallucinations,

as well as arm pain. *Id.* at 1100 (Jan. 27, 2020), 1130–31 (Feb. 14, 2020), 1128 (Mar. 3, 2020),

1125 (Mar. 10, 2020), 1098 (Mar. 13, 2020), 1120, (Mar. 16, 2020), 1118 (Mar. 20, 2020), 1115

(Apr. 2, 2020), 1111–12 (Apr. 13, 2020), 1108–09 (Apr. 17, 2020), 1204 (Ex. B30F, Community

Health Office Treatment Records (May 7, 2020)), 1200 (May 11, 2020), 1194 (June 8, 2020),

1183 (July 15, 2020). She also reported at times that her medication was effective in managing

her symptoms. *Id.* at 1192 (June 17, 2020), 1189 (June 25, 2020), 1185 (June 26, 2020), 1180

(July 21, 2020), 1177 (July 28, 2020), 1173 (Aug. 3, 2020).

### 3.  Medical Opinions

On June 19, 2019, state agency psychological consultant Dr. Katrin Carlson, Psy.D.

opined that Plaintiff was moderately impaired in the ability to carry out detailed instructions,

maintain attention and concentration for extended periods, complete a normal workday and

workweek without interruptions from psychologically based symptoms and to perform at a

consistent pace without an unreasonable number and length of rest periods, and interact

appropriately with the general public. *Id.* at 93–94 (Ex. B3A (Disability Determination

Explanation (Aug. 14, 2019)). Dr. Carlson also opined that opined that Plaintiff's mental

symptoms would occasionally impact her ability to maintain concentration, persistence, or pace

for complex tasks, but that she could focus and persist in completing simple tasks over the

duration of a normal workday. *Id.* at 94. She further concluded that Plaintiff could occasionally

interact with the public, interact with coworkers and supervisors without difficulty, and maintain

a "reasonable appearance." *Id.*

On July 19, 2019, Plaintiff was assessed by consultative examiner Dr. Steven Weisman.

*Id.* at 1075 (Ex. B25F, Dr. Steven Weisman Examination Notes). Plaintiff reported low vision,

seizure disorder, degenerative disc disease of the lumbar spine, obesity, and depression and that

she hears voices and is afraid to go anywhere. *Id.* She was observed to have a slow, wide-based gait but had no instability and required no assistive devices. *Id.* at 1077. Dr. Weisman also reported that Plaintiff had reduced range of motion in her shoulders and lumbar spine. *Id.* at 1078–79. Based on this evaluation, Dr. Weisman opined that Plaintiff was limited to standing or walking for six hours during the day, with no restrictions on sitting. *Id.* at 1080. She had no limits on carrying, but was limited to occasional postural activities including kneeling, bending, and crawling. *Id.* She was able to engage in frequent manipulative activities. *Id.* Dr. Weisman also indicated additional unspecified restrictions due to Plaintiff's psychological disorders and auditory hallucinations. *Id.* According to Dr. Weisman, Plaintiff could stand for up to six hours per day with adequate rest and could sit for a full workday with adequate breaks. *Id.* at 1081. Dr. Weisman also reported no sensory deficits and that Plaintiff could perform rapid alternating movements, dress and undress, rise from a seated position, use a zipper, and tie shoes. *Id.* at 1077, 1080.

On August 13, 2019, state agency reviewer Dr. Donald Williams opined that Plaintiff could occasionally lift up to fifty pounds and could frequently carry up to twenty-five pounds. *Id.* at 91. He also reported that she could stand and/or walk for six hours and sit for six hours during an eight-hour workday. *Id.* at 92. Plaintiff could frequently climb ramps and stairs, balance, kneel, crouch, and crawl, could occasionally stoop, but could never climb ladders, ropes, or scaffolds. *Id.* Dr. Williams reported no manipulative, visual, or communicative limitations but did note that Plaintiff should avoid all exposure to hazards like machinery and heights due to her seizure disorder. *Id.* at 92–93.

On October 30, 2019, state agency psychological consultant Dr. Susan Uber, Ph.D., opined that Plaintiff had the same level of limitations indicated by Dr. Carlson in June 2019. *Id.*

at 116–17 (Ex. B5A, Disability Determination Explanation – Reconsideration); *see also* Def.'s

Resp. to Pl.'s Statement of Facts ¶ 59(a), ECF No. 14-2 ("Def.'s SMF") (noting that Dr. Uber's

assessment of Plaintiff's social limitations was the same as Dr. Carlson's).

On November 7, 2019, state agency reviewer Dr. David Braverman opined that Plaintiff

had the same level of limitations identified by Dr. Williams. Tr. At 114–15.

The record does not contain medical opinions from any of Plaintiff's treating providers.

### 4.   Vocational Expert Testimony

At the hearing before the ALJ, a vocational expert testified that someone with the

residual functional capacity assessed by the ALJ, *see infra* Part I.A.5, would be unable to

perform Plaintiff's past work. Tr. at 47. The ALJ testified that there would, however, be jobs in

the national economy for someone with these limitations. *Id.* In response to questions from the

ALJ, the vocational expert noted that there would be no jobs available if such a person would be

off task consistently for fifteen percent or more of the workday or consistently absent for one day

per week. *Id.* at 47–48.

### 5.   ALJ Decision

At Step One, the ALJ found that Plaintiff had not engaged in substantial gainful activity

since her alleged onset date of February 16, 2018. Tr. at 14 (ALJ Decision).

At Step Two, the ALJ found that Plaintiff had the following severe impairments:

seizures, degenerative disease of the lumbar spine, obesity, and major depressive disorder. *Id.*

The ALJ also found that Plaintiff had a medically determinable vision disorder but that this

impairment was non-severe. *Id.*

At Step 3, the ALJ found that none of Plaintiff's impairments met or equaled the severity

of one of the Commissioner's listed impairments. *Id.* at 15.

The ALJ then determined Plaintiff's residual functional capacity ("RFC") to be light work. *Id.* at 17. The ALJ found that Plaintiff was limited to simple, routine, repetitive work tasks; that she must avoid hazards such as heights, vibration, and dangerous machinery; and that she could have occasional interaction with supervisors, coworkers, and the public. *Id.*

At Step Four, the ALJ found that Plaintiff was unable to perform any past relevant work. *Id.* at 21.

At Step Five, the ALJ found that Plaintiff could perform other work in the national economy. *Id.* at 22. The ALJ relied on testimony from the vocational expert, who opined that Plaintiff would be able to perform the requirements of representative occupations such as laundry sorter, merchandise marker, or collator operator. *Id.* at 22–23.

Accordingly, the ALJ concluded that Plaintiff was not disabled from her alleged onset date to the date of the ALJ's decision. *Id.* at 23.

### B.  Procedural History

On November 26, 2021, Plaintiff filed her Complaint under 42 U.S.C. § 405(g), seeking review of the Commissioner's final decision denying her applications. Compl.

On March 23, 2022, Plaintiff filed a motion to reverse the decision of the Commissioner. Pl.'s Mot.

On May 13, 2022, the Commissioner filed a motion to affirm her decision. Def.'s Mot.

## II.   STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court reviewing a disability determination "must determine whether the Commissioner's conclusions 'are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard.'" *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) (quoting *Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997)); *see also*

*Moreau v. Berryhill*, No. 3:17-cv-396 (JCH), 2018 WL 1316197, at *3 (D. Conn. Mar. 14, 2018)

("[T]he court may only set aside the ALJ's determination as to social security disability if the

decision 'is based upon legal error or is not supported by substantial evidence.'" (quoting

*Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998))).

"Substantial evidence is 'more than a mere scintilla.'" *Brault v. Soc. Sec. Admin.,*

*Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam) (quoting *Moran v. Astrue*, 569 F.3d 108,

112 (2d Cir. 2009)). "It means such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Moran*, 569 F.3d at 112 (quoting *Burgess v. Astrue*, 537 F.3d

117, 127 (2d Cir. 2008)). It is a "very deferential standard of review—even more so than the

'clearly erroneous' standard." *Brault*, 683 F.3d at 448 (citing *Dickinson v. Zurko*, 527 U.S. 150,

153 (1999)).

## III.    DISCUSSION

The Social Security Act defines disability as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which

can be expected to result in death or which has lasted or can be expected to last for a continuous

period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

To determine whether a claimant is disabled under the Social Security Act, an ALJ must

perform a five-step evaluation. As the agency explains:

> (i) At the first step, we consider your work activity, if any. If you
> are doing substantial gainful activity, we will find that you are not
> disabled . . . ;
>
> (ii) At the second step, we consider the medical severity of your
> impairment(s). If you do not have a severe medically determinable
> physical or mental impairment that meets the duration requirement
> in § 404.1509, or a combination of impairments that is severe and
> meets the duration requirement, we will find that you are not
> disabled . . . ;

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled . . . ;

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled . . . ;

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled . . . .

20 C.F.R. § 404.1520(a)(4).

Plaintiff argues that the ALJ erred in formulating Plaintiff's RFC. Specifically, she argues that the ALJ committed legal error by failing to develop the record and by determining Plaintiff's RFC without reliable medical opinion evidence from which it could assess Plaintiff's limitations. Pl.'s Mem. at 7. Plaintiff argues that, as a result of this failure to develop the record, the ALJ did not consider all of the relevant factors that would affect Plaintiff's ability to perform exertional and non-exertional job functions. *Id.* at 11.

**A.  The ALJ's RFC Determination**

In between steps three and four, the ALJ must determine the claimant's residual functional capacity, "the most an individual still can do despite his or her impairments." *Felder v. Astrue*, No. 10-cv-5747 (DLI), 2012 WL 3993594, at *11 (E.D.N.Y. Sept. 11, 2012) (citing 20 C.F.R. § 404.1545(a)). A claimant's mental RFC must account for "the nature and extent of [the claimant's] mental limitations and restrictions," including "limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, co-workers, and work pressures in a work setting." 20 C.F.R. §§ 404.1545(c), 416.945(c). Physical RFC, meanwhile, captures limits in the claimant's "ability to perform certain physical demands

of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions." 20 C.F.R. §§ 404.1545(b), 416.945(b).

In formulating the claimant's RFC, "the ALJ must consider all the relevant evidence, including medical opinions and facts, physical and mental abilities, non-severe impairments, and [p]laintiff's subjective evidence of symptoms." *Fontanez v. Colvin*, No. 16-cv-01300 (PKC), 2017 WL 4334127, at *19 (E.D.N.Y. Sept. 28, 2017) (alteration in original) (internal quotation marks omitted). While the ALJ must consider all relevant evidence, medical opinion evidence plays a critical role: "an ALJ who makes an RFC determination in the absence of supporting expert medical opinion has improperly substituted his own opinion for that of a physician, and has committed legal error." *Staggers v. Colvin*, No. 3:14-cv-717 (JCH), 2015 WL 4751123, at *2 (D. Conn. Aug. 11, 2015) (quoting *Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 347 (E.D.N.Y. 2010)). Furthermore, failure to acknowledge relevant evidence or to explain its implicit rejection is plain error. *Pagan ex rel. Pagan v. Chater*, 923 F. Supp. 547, 556 (S.D.N.Y. 1996).

In determining a claimant's RFC, the ALJ must consider the claimant's subjective symptoms, including pain, to the extent these symptoms "can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(a). "When the medical signs or laboratory findings" show that the claimant has a "medically determinable impairment(s) that could reasonably be expected to produce" the claimant's subjective symptoms, the ALJ "must then evaluate the intensity and persistence of [the claimant's] symptoms" to determine how these symptoms limits the claimant's ability to work. 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1).

Here, the ALJ found that Plaintiff had the residual functional capacity to perform light work, except that she was limited to "occasional bending, balancing, twisting, squatting, kneeling, crawling, climbing, but no climbing of ropes, scaffolds, and ladders." Tr. at 17. According to the ALJ, Plaintiff must "avoid hazards such as heights, vibration, and dangerous machinery including driving" and be limited to "simple, routine, repetitious work tasks." *Id.* The ALJ further found that Plaintiff could have "occasional interaction" with supervisors, coworkers, and the public.

In formulating Plaintiff's RFC, the ALJ determined that Plaintiff's medically determinable impairments could be expected to cause her alleged symptoms, but that her statements regarding the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with the medical evidence or other evidence in the record. *Id.* at 18. The ALJ found the opinions of the state agency consultants "partially persuasive." *Id.* at 20. While recognizing limits to the consultants' assessments, the ALJ found that their opinions were supported by a direct examination of Plaintiff's medical records and consistent with her reports of daily activities. *Id.* In particular, the ALJ relied on the psychological consultants' conclusion that Plaintiff "can concentrate and persist in completing simple tasks over the duration of a normal workday." *Id.*; *see also id.* at 94 (Dr. Carlson's assessment), 117 (Dr. Uber's assessment).

## B. The ALJ's Duty to Develop the Record

"The claimant has the general burden of proving that he or she has a disability within the meaning of the Act and bears the burden of proving his or her case at steps one through four of the sequential five-step framework." *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (citation and internal quotation marks omitted). Nonetheless, "[b]ecause a hearing on disability benefits is a nonadversarial proceeding, the ALJ generally has an affirmative obligation to

develop the administrative record." *Id.* (alteration in original) (internal quotation marks omitted).

Here, Plaintiff was represented by counsel in her proceedings before the agency, Tr. at 29, but

"[t]he ALJ's duty to develop the record remains regardless of whether the claimant is represented

by counsel." *Starr v. Comm'r of Soc. Sec. Admin.*, 581 F. Supp. 3d 525, 533 (S.D.N.Y. 2022).

"Whether the ALJ has satisfied this duty to develop the record is a threshold question" that the

Court must consider "[b]efore determining whether the Commissioner's final decision is

supported by substantial evidence under 42 U.S.C. § 405(g)." *Jackson v. Kijakazi*, 588 F. Supp.

3d 558, 577 (S.D.N.Y. 2022); *see also Moran v. Astrue*, 569 F.3d 108, 114–15 (2d Cir. 2009)

("We vacate not because the ALJ's decision was not supported by substantial evidence but

because the ALJ should have developed a more comprehensive record before making his

decision.").

  Plaintiff contends that, because the ALJ found none of the available medical opinions

fully persuasive, he was left with only his own lay opinion in sorting through the limitations

imposed by Plaintiff's multiple medical and psychiatric conditions. *See* Pl.'s Mem. at 7.

According to Plaintiff, the ALJ should have requested RFC assessments from Plaintiff's treating

sources, instead of making an RFC determination without reliable medical opinion evidence. *See*

*id.* at 10. Plaintiff further argues that, without persuasive medical opinions to guide his RFC

formulation, the ALJ drew unsupported conclusions from the record and failed to consider all the

relevant factors. *See id.* at 8, 11–12.

  In response, the Commissioner argues that the ALJ had all of the evidence he needed to

formulate Plaintiff's RFC. *See* Def.'s Mem. at 10. She contends that the ALJ properly evaluated

and modified the consultants' RFC assessments and that the ALJ's ultimate RFC formulation

was supported by substantial evidence. *See id.* at 4, 8. Thus, the Commissioner contends, the ALJ had no obligation to further develop the record. *See id.* at 10.

The Court disagrees.

The duty to develop the record requires an ALJ to "seek additional evidence or clarifications from medical sources when documentation in the record is insufficient to determine whether the claimant is disabled." *Acosta Cuevas v. Comm'r of Soc. Sec.*, No. 20-cv-0502 (AJN) (KHP), 2021 WL 363682, at *10 (S.D.N.Y. Jan. 29, 2021) (quoting *Sanchez v. Comm'r of Soc. Sec.*, No. 18-cv-2027 (KMK), 2019 WL 4673740, at *8 (S.D.N.Y. Sept. 25, 2019)), *report and recommendation adopted*, 2022 WL 717612 (S.D.N.Y. Mar. 10, 2022). "This duty is particularly important where a claimant alleges disability due to mental illness." *Id.*

The ALJ's general obligation to develop the record applies to the formulation of the claimant's RFC. "When an ALJ has to determine an RFC, his failure to request a functional assessment when no such assessment exists in the record or when any such assessments are insufficient constitutes a failure of his duty to develop the record." *Jackson*, 588 F. Supp. 3d at 583. Courts have also held that ALJs erred by failing to develop the record when they had obtained RFC assessments but gave "little weight" to each of them, leaving the ALJ with no persuasive medical opinions upon which to base the RFC. *See Trombley v. Berryhill*, No. 1:17-cv-00131 (MAT), 2019 WL 1198354, at *4 (W.D.N.Y. Mar. 14, 2019) (remanding for further development of the record).

On the other hand, "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history, the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999) (internal quotation marks omitted). Thus, "in certain circumstances, it

is not error for an ALJ to make an RFC finding in the absence of an assessment from a treating physician." *Staggers*, 2015 WL 4751123, at *3. Although not binding precedent, the Second Circuit's summary orders suggest that a remand for further development of the record is not necessary when the record contained no formal RFC assessments but "the ALJ had a number of functional assessments from a treating source," *Tankisi v. Comm'r. of Soc. Sec.*, 521 F. App'x 29, 34 (2d Cir. 2013) (summary order), or when the ALJ rejected the treating physician's medical opinion but relied on the physician's "contemporaneous treatment notes," *Monroe v. Comm'r of Soc. Sec.*, 676 F. App'x 5, 8 (2d Cir. 2017) (summary order). Similarly, in *Pellam v. Astrue*, 508 F. App'x 87 (2d Cir. 2013) (summary order), the record did not contain an RFC assessment from the claimant's treating physician, and the ALJ rejected the consultant examiner's RFC assessment, leaving no credited medical opinions in the record. Nonetheless, the ALJ had no "further obligation to supplement the record by acquiring a medical source statement from one of the treating physicians" because the consultant's opinion was "largely consistent with the ALJ's conclusions." *Id.* at 90 & n.2.

The Court's reasoning in *Pellam* is instructive. Here, as in that case, the ALJ did not seek an RFC assessment from a treating source and formulated an RFC that was largely consistent with a consultant's medical opinion despite not fully credit that opinion. But unlike the ALJ in *Pellam*, the ALJ who decided Plaintiff's claim did not entirely reject the consultants' opinions, but merely found that they were only "partially persuasive." Tr. at 20. Thus, similar to *Pellam*, further development of the record is required solely because the ALJ failed to obtain an RFC assessment from a treating source and found some fault in the consultants' medical opinions.

This conclusion, however, does not end the inquiry. A consultant's opinion, though rejected by the ALJ, could be sufficient to support an RFC assessment when it is supported by

other evidence in the record, including treatment notes and objective test results. *See Pellam*, 508 F. App'x at 90–91. And "remand is not always required when an ALJ fails in his duty to request opinions, particularly where . . . the record contains sufficient evidence from which an ALJ can assess the petitioner's residual functional capacity." *Tankisi*, 521 F. App'x at 34. These summary orders imply that a consultant's opinion does not adequately justify an ALJ's RFC assessment when the opinion is not supported by other evidence in the record. In that circumstance, these cases suggest, the ALJ may be required to request a medical opinion from a treating physician.

But these decisions were issued against the backdrop of the "treating physician rule," which applies to claims filed before March 27, 2017, and requires an ALJ to assign controlling weight to the opinion of a treating physicians as long as it is well-supported by medical techniques and not inconsistent with the other evidence in the record. *See* 20 C.F.R. § 404.1527(c)(2). Although the treating physician rule does not address directly an ALJ's obligation to obtain medical opinions, it is "inextricably linked to a broader duty to develop the record." *Jamison v. Acting Comm'r of Soc. Sec.*, 600 F. Supp. 3d 304, 309 (S.D.N.Y. 2022). "Because it was possible that a medical source statement could be given controlling weight, the failure to secure one was particularly troublesome under the old treating physician rule." *Angelica M. v. Saul*, No. 3:20-CV-00727 (JCH), 2021 WL 2947679, at *6 (D. Conn. July 14, 2021).

Thus, courts applying the treating physician rule have repeatedly held "that remand is required when ALJs fail to satisfy their duty to develop the record by having a record with the only functional assessment coming from a CE after a single examination and failing to request (and receive) a functional assessment from the treating physician(s)." *Romero v. Commissioner of Soc. Sec.*, No. 18-cv-10248 (KHP), 2020 WL 3412936, at *13 (S.D.N.Y. June 22, 2020). In

such circumstances, courts concluded that there was not sufficient evidence from which the ALJ

could assess the claimant's RFC. *See Fontanez*, 2017 WL 4334127, at *22 ("[G]iven that there

was insufficient medical evidence supporting the ALJ's mental RFC determination, the ALJ had

a duty to develop the record."); *Staggers*, 2015 WL 4751123, at *3 (holding that the ALJ's RFC

was not supported by sufficient evidence because "the opinions on which the ALJ relied are

either too vague to be useful or inconsistent with the ALJ's conclusion"); *Kurlan v. Berryhill*,

No. 3:18-cv-00062 (MPS), 2019 WL 978817, at *3–4 (D. Conn. Feb. 28, 2019) (after noting that

the ALJ had rejected all of the relevant medical opinions, considering whether the ALJ's RFC

assessment was nonetheless supported by sufficient evidence and concluding that it was not

because it was formulated "without the support of specific functional information in the clinical

notes" or other evidence in the record).

      Plaintiff's claim was filed after March 27, 2017, and therefore is subject to the new

regulations. These new rules no longer require that an ALJ give controlling weight to a well-

supported treating physician's opinion and instead prescribe a multi-factor approach for all

medical opinions regardless of source. *See* 20 C.F.R. § 404.1520c. Although the Second Circuit

has not yet addressed the impact of the new regulations on the case law discussed above, courts

in this Circuit have concluded that the principles followed in *Tankisi*, *Pellam*, and *Monroe* still

apply: "remand for failure to develop the record by obtaining a particular medical source

statement depends on the circumstances of the case and will only be required if the record does

not otherwise 'contain[] sufficient evidence from which an ALJ can assess the petitioner's

[RFC].'" *Angelica M.*, 2021 WL 2947679, at *6 (alterations in original) (quoting *Tankisi*, 521 F.

App'x at 34); *see also Russ v. Comm'r of Soc. Sec.*, 582 F. Supp. 3d 151, 163 (S.D.N.Y. 2022)

("Although the treating physician rule has been abolished, the principle espoused by *Tankisi* still

applies: whether remand is required because of failure to obtain an opinion from the claimant's treating physician depends on whether the ALJ could have reached an informed decision based on substantial evidence without it.").

These courts have held that, even though a treating physician's opinion is no longer entitled to controlling weight, an ALJ may be required to request a functional assessment from a treating source "when no such assessment exists in the record or when any such assessments are insufficient." *Jackson*, 588 F. Supp. 3d at 583 (applying the new regulations); *see also Almonte v. Comm'r of Soc. Sec.*, No. 21-cv-3091 (PKC), 2022 WL 4451042, at *5 (E.D.N.Y. Sept. 23, 2022) (holding that the ALJ's obligation "to obtain medical opinions—not just medical records—from a claimant's treating physicians . . . continues to exist even in cases involving claims filed after March 27, 2017, to which the 'treating physician rule' no longer applies"). "[D]espite the new regulations, an ALJ's duty to develop the record 'takes on heightened importance with respect to a claimant's treating medical sources, because those sources "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations."'" *Jackson*, 588 F. Supp. 3d at 583 (alteration in original) (quoting *Acosta Cuevas*, 2021 WL 363682, at *11).

Here, the ALJ did not obtain a medical opinion from any of Plaintiff's treating mental or behavioral health providers. Moreover, the psychological consultants in this case did not actually examine the claimant. Under the treating physician rule, district courts have held that, "[w]hen evaluating a mental disability, 'it is improper to rely on the opinion of a non-treating, non-examining doctor because the inherent subjectivity of a psychiatric diagnosis requires the

physician rendering the diagnosis to personally observe the patient.'" *Fontanez*, 2017 WL 4334127, at *21 (quoting *Fofana v. Astrue*, No. 10 Civ. 0071 (LTS) (THK), 2011 WL 4987649, at *20 (S.D.N.Y. Aug. 9, 2011)). Courts have also concluded that the new regulations do not displace "[t]he general rule . . . that the written reports of medical advisors who have not personally examined the claimant deserve little weight in the overall evaluation of disability." *Keeby ex rel. T.K. v. Comm'r of Soc. Sec.*, No. 21-cv-1202 (PKC), 2022 WL 4451004, at *5 (E.D.N.Y. Sept. 23, 2022).

Applying these principles, courts deciding cases under the new regulations have held that remand may be required in cases when the ALJ failed to obtain RFC assessments from treating sources and relied solely on the medical opinions of consultants, particularly when those consultants did not examine the claimant themselves. *See, e.g.*, *Acosta Cuevas*, 2021 WL 363682, at *11 (ALJ failed to develop the record regarding the claimant's mental impairments when the record contained only the opinions of only two non-examining consultants and a functional assessment from a treating source early in the claimant's treatment, which the ALJ did not adequately consider); *Keeby*, 2022 WL 4451004, at *5 (ALJ failed to develop the record when the ALJ considered only the medical opinion of one non-examining consultant and failed to obtain medical opinions from any treating physicians); *Jackson*, 588 F. Supp. 3d at 583 (ALJ failed to adequately develop the record regarding the claimant's physical impairments when the only functional assessments in the record regarding these impairments were completed by consulting examiners).

In accord with these decisions, the Court will consider whether "the record contains sufficient evidence from which an ALJ can assess the petitioner's residual functional capacity"

when assessing the ALJ's failure to obtain a mental RFC assessment from a treating provider and reliance only on the assessments of non-examining consultants. *Tankisi*, 521 F. App'x at 34.

Here, both Dr. Carlson and Dr. Uber opined that Plaintiff had limitations in sustained concentration and persistence and in social interactions. Tr. at 93–94, 116–17. With respect to concentration and persistence, the consultants assessed Plaintiff as moderately limited in her ability to maintain attention and concentration for extended periods, her ability to carry out detailed instructions, and her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. *Id.* at 93–94, 116. After evaluating these limitations, the consultants concluded that, although variable mood symptoms may occasionally impact Plaintiff's ability to perform complex tasks, she could "focus and persist in completing simple tasks over the duration of a normal workday." *Id.* at 94, 116. As for social interaction, the consultants opined that Plaintiff was moderately limited in her ability to interact appropriately with the general public and concluded that she could "handle occasional interaction with the public," was "able to engage with coworkers/supervisors without difficulty," and was "able to maintain reasonable appearance." *Id.* at 94, 117.

The ALJ substantially adopted the consultants' RFC assessments. He agreed that Plaintiff was limited to only "occasional interaction" with the public and extended this limitation to supervisors and coworkers. *See id.* at 17. And consistent with the consultants' assessments, the ALJ limited Plaintiff to "simple, routine, repetitive work tasks," but otherwise did not include any limitations related to Plaintiff's ability to perform a job consistently on a day-to-day basis. *See id.*

This RFC, however, is not supported by other evidence in the record, and the opinions of the non-examining psychological consultants are insufficient to justify it.

First, there is at least an ambiguity—if not an inconsistency—in the consultants' opinion that Plaintiff is moderately limited in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms but could nonetheless persist in completing simple tasks over the duration of the normal workday. *See id.* at 94, 116. In *Acosta Cuevas*, the two mental consultants assessed the same "moderate" limitation in the claimant's ability to maintain a regular work schedule, but the ALJ "[did] not discuss "anywhere in her decision how the RFC she fashioned account[ed] for this moderate limitation." 2021 WL 363682, at *12. The court held that, because the mental consultants "never examined Plaintiff," and "no functional assessment existed in the record supporting Plaintiff's ability to maintain a regular work schedule," an "obvious gap existed with respect to this moderate limitation, and the ALJ failed her duty to develop the record by not seeking more information." *Id.* The same reasoning applies to this case, where the ALJ neither incorporated nor discussed any restrictions related to the same limitation as long as Plaintiff was limited to "simple, routine, repetitious work tasks." Tr. at 94, 116 (consultant assessments), 17 (ALJ decision). Here, as in *Acosta Cuevas*, the ALJ failed to address the gap "with respect to this moderate limitation" by further developing the record and seeking more information. 2021 WL 363682, at *12.

The Commissioner notes that the former assessment of a "moderate limitation" appears on the section of the evaluation form that the Social Security Administration describes as "merely a worksheet to aid in deciding the presence and degree of functional limitations" that "does not constitute the RFC assessment." *See Torres v. Comm'r of Soc. Sec.*, No. 17-cv-579 (HBS), 2019 WL 2117651, at *3 (W.D.N.Y. May 15, 2019) (quoting SSA Program Operations

Manual System (POMS) DI 24510.060(B)(2)(a)). The latter conclusion regarding Plaintiff's ability to "focus and persist" over a normal workday, meanwhile, comes from the narrative section where "the actual mental RFC assessment is recorded." *See id.* But even if the limitation based on interruption from psychologically based symptoms was not included in the consultants' formal RFC assessment, it still constitutes an aspect of the consultants' medical opinion and must be considered by the ALJ along with all other relevant evidence.

Furthermore, the ALJ's apparent conclusion that Plaintiff would not experience interruptions as long as she was limited to simple and repetitive tasks is belied by the record. The ALJ reasoned in support of this conclusion that watching television and doing crosswords indicates "preserved attention and concentration." Tr. at 18. Even assuming that these activities require the degree of focus and attention that would be required to perform a job, the record does not show that Plaintiff engaged in them consistently. Plaintiff testified that she would "get up, sit up on my bad and maybe watch TV, maybe do a crossword puzzle," only on a "good day." *Id.* at 38. On a bad day, which she testified occurred about half the time, she wouldn't be able to get out of bed or "do anything" all day. *Id.* Contemporaneous treatment notes also reflect Plaintiff's reports that she stayed in bed all day when feeling overwhelmed and at times even ate meals in bed. *See id.* at 356 (reporting challenges "resulting in client returning to her bed" and noting that "[c]lient will work on regimen that reduces time spent in bed from 10–11 hours to 7–8 hours") 358 ("Client reports challenges resulting in 1 day in bed."), 361 ("Client will evaluate pros and cons of staying in her bed in pajamas"), 971 ("Client stated that she stays in bed all day and that includes eating in bed."). The ALJ's reliance on Plaintiff's ability to care for two grandchildren as evidence of her competence was also flawed in light of evidence showing that another grandchild was removed by DCF and was being raised in foster care. *See id.* at 18, 357, 358–59.

The ambiguity in the consultants' opinion regarding Plaintiff's ability to work consistently is magnified by this conflicting evidence in the underlying record. Thus, the ALJ was required to resolve this ambiguity by further developing the record. *See Aurilio v. Berryhill*, No. 3:18-cv-00587 (MPS), 2019 WL 4438196, at *4 n.5 (D. Conn. Sept. 16, 2019) ("To the extent that the opinion was ambiguous as to the time period to which it relates, the ALJ had a duty to further develop the record.").

Second, the ALJ's conclusion that Plaintiff could present appropriately for work is not supported by sufficient evidence in the record. The consultants opined that Plaintiff could "maintain reasonable appearance," Tr. at 94, 117, and the ALJ appeared to adopt this conclusion by not including any limitation related to this issue. The ALJ noted Plaintiff's reports that she had "lost interest in taking care of herself including meeting her hygienic needs" and that she experienced auditory hallucinations. *Id.* at 19. But the ALJ found that these statements were not consistent with the other evidence in the record because psychiatric examinations found that Plaintiff was "clean, dressed appropriately for weather, [and] was cooperative"; that her "speech was clear and logical"; that her "mood and affect was euthymic"; and that she otherwise presented normally. *Id.* at 20 (citing *id.* at 972, 1164, 1167, 1170). The ALJ also reported that Plaintiff "reported doing better on medication." *Id.* at 20.

The ALJ's basis for rejecting the severity of Plaintiff's reports reflects a selective reading of the record. Although Plaintiff appeared to be dressed clearly and appropriately at some medical appointments, contemporaneous notes from Plaintiff's behavioral health provider repeatedly reported that she presented with a "decrease in grooming" or "slightly disheveled." *Id.* at 353, 354, 358, 359, 361. The record also reflects erratic behaviors such as ripping up her

partner's clothes or ranting and raving at her roommate, which twice led to the police being called. *See id.* at 1128.

Although the ALJ notes that Plaintiff has been "doing better" on medication, *id.* at 20 (citing, *e.g.*, *id.* at 1173, 1177, 1180, 1185, 1189, 1192), the record also shows that Plaintiff continued to report symptoms of depression and auditory hallucinations leading up to her hearing. *See id.* at 1108–09, 1111–12, 1115, 1183, 1194, 1200, 1204. More generally, indications that symptoms have improved "do not give any indication of the severity of [the] symptoms around the time of the appointment, only that they were 'better' than" they had been previously. *Aurilio*, 2019 WL 4438196, at *9. For someone like Plaintiff with multiple severe physical and mental impairments, "'better' does not necessarily mean 'healthy enough to work a consistent schedule.'" *Id.*

As the vocational expert's testimony suggests, consistent presentation and attention is important in performing a job, and the type of inconsistency evident in Plaintiff's testimony and in her behavioral health records may interfere with her ability to perform a full-time job. Thus, the ALJ's conclusion—consistent with the consultants' assessment—that Plaintiff could be consistently presentable and focused on a job, as long as she was limited to simple and repetitive tasks, is not supported by sufficient evidence in the record.[3]

Here, the ALJ's formulation of Plaintiff's mental RFC relied on medical opinions only from non-examining consultants. Although this fact does not by itself require remand, an RFC based on such opinions must be supported by evidence in the underlying record. Because there

---

[3] Plaintiff also challenges the ALJ's assessment of her physical RFC. *See* Pl.'s Mem. at 13. Here, she notes symptoms such as a "slow wide based gait," a reduced range of motion in her shoulders, hips, and lumbar spine, and frequent falls, *id.*, but she does not explain how these symptoms are inconsistent with the demands of light work, subject to the additional limitations imposed by the ALJ. Plaintiff also notes that she had "so much pain that she had to crawl up stairs" in 2019, *id.*, but this symptom was linked to an isolated incident in which she fell and hurt her ankle rather than to a long-term impairment, *see* Tr. at 957–58, 962, 980.

was not sufficient evidence from which the ALJ could assess Plaintiff's mental RFC, the ALJ had an obligation to develop the record further by obtaining RFC assessments from Plaintiff's treating providers. *See Fontanez*, 2017 WL 4334127, at *22 ("[G]iven that there was insufficient medical evidence supporting the ALJ's mental RFC determination, the ALJ had a duty to develop the record.").

Accordingly, the Court will vacate the Commissioner's decision and remand this case to the Social Security Administration.

**IV.     CONCLUSION**

For the foregoing reasons, Plaintiff's motion is **GRANTED**, and the Commissioner's motion is **DENIED**. The decision of the Commissioner is **VACATED** and **REMANDED** for further proceedings consistent with this Ruling and Order.

On remand, the ALJ is instructed to develop the record further by attempting to obtain assessments from Plaintiff's treating providers regarding her mental RFC.

**SO ORDERED** at Bridgeport, Connecticut, this 24th day of March, 2023.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE